**Jerry BRACK, Plaintiff,**

v.

**SHONEY'S, INC., d/b/a Captain D's # 3126, Defendant.**

No. 01–2997 DV.

United States District Court, W.D. Tennessee, Western Division.

March 12, 2003.

**941**

Christopher L. Taylor, Hill Boren, Florence M. Johnson, Esq., Perkins, Johnson & Settle, Memphis, TN, for Jerry Brack.

James R. Mulroy, II, Esq., Joseph Kellam Warren, O. John Norris, III, Lewis, Fisher, Henderson, Claxton and Mulroy, Memphis, TN, for Shoney's, Inc.

Diane Vescovo, U.S. District Court, Memphis, TN, pro se.

1. Plaintiff uses the term "color discrimination" to refer to discrimination based on race.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

DONALD, District Judge.

Before the Court is Defendant Shoney's Inc., d/b/a Captain D's # 3126, ("Captain D's")' motion for summary judgment. Plaintiff Jerry Brack ("Brack") asserts three claims for color discrimination[1] against Defendant pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e; 42 U.S.C. § 1981; and the Tennessee Human Rights Act ("THRA"). Plaintiff also asserts claims for retaliation, hostile work environment/racial harassment, outrageous conduct/intentional infliction of emotional distress, and breach of contract. Defendant argues that no genuine issue of material fact exists as to Plaintiff's claims for color discrimination because 1) no direct evidence of discrimination exists, 2) Plaintiff failed to establish a prima facie case of color discrimination, and 3) even if Plaintiff established a prima facie case, Defendant had legitimate, non-discriminatory reasons for its actions which Plaintiff failed to establish were pretextual. Likewise, Defendant maintains that Plaintiff's retaliation claim should be summarily adjudicated because he failed to establish a prima facie case of retaliation. Moreover, Defendant contends that even if Plaintiff established a prima facie case, Defendant had legitimate, non-discriminatory reasons for its actions which Plaintiff failed to establish were pretextual. With respect to Plaintiff's claim for hostile work environment/harassment, Defendant contends that Plaintiff failed to establish a prima facie case, and regardless, Defendant is entitled to the affirmative defense set forth in *Faragher v. City of Boca Raton*, 524 U.S. 775, 808, 118 S.Ct.

For purposes of this motion, the Court also uses the term "color discrimination."

2275, 141 L.Ed.2d 662, (1998). Additionally, Defendant asserts that the record does not reveal that Defendant's conduct was so extreme and outrageous as to support a charge of outrageous conduct/intentional infliction of emotional distress. Finally, Defendant argues that Plaintiff cannot succeed on his breach of contract claim because the writing on which Plaintiff bases his claim was not an enforceable contract. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1334. For the following reasons, the Court grants in part and denies in part Defendant's motion for summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On September 14, 2000, Victoria Chevalier, an Area Manager for Captains D's restaurants, interviewed and hired Plaintiff, a 44 year old dark complected-black male. Pl. Dep. pp. 80–81, Ex. 3. Defendant's employment records indicate that Ms. Chevalier is also black. Upon being hired. Plaintiff trained as a part-time Supervisor Trainee at the Elvis Presley store. Chevalier Dep. pp. 38–39. After completing his training period, Ms. Chevalier transferred Plaintiff to the Union Avenue store. Pl. Dep. pp. 45, 67–68. Plaintiff worked as a part-time Restaurant Supervisor making $9.00 an hour. *Id.* On November 14, 2000, Plaintiff received a written warning from Ms. Chevalier for a $40 shortage that occurred during a shift he was supervising. *Id.* at 75, 157–61, Ex. 9. The written warning, which Plaintiff signed, stated that Plaintiff must become more accurate with cash handling procedures or further disciplinary action would occur up to termination. *Id.* at 157–61, Ex. 9. Plaintiff did not appeal the issuance of the written warning. *Id.*

On December 19, 2000, Plaintiff signed a writing, which was also signed by Ms. Chevalier and Greg Jackson, that provided:

Jerry Brack ss# 411–98–4060 is presently a Restaurant Supervisor [who] will be promoted to [Restaurant Manager] deadline December 30, 2000 At [sic] a pay Rate [sic] of $27,300 per year. That is $525.00 per week. January 1, 2001[,] it will become effective.

*Id.* at 256–57, Ex. 22. On December 30, 2000, Ms. Chevalier promoted Plaintiff from Restaurant Supervisor to Restaurant Manager of the Union Avenue store, at a salary of $525.00 per week. *Id.* at 82. Plaintiff replaced Dominic Meredith, who has a lighter skin tone than Plaintiff, as the Restaurant Manager. *Id.* at 54–55, 124. Marcus North replaced Plaintiff in the lower position of Restaurant Supervisor when Plaintiff was promoted. *Id.* at 55. Mr. North has a lighter skin tone than Plaintiff. *Id.* at 54–55, 124.

As Restaurant Manager, Plaintiff became accountable for the food and flow of the shift. Chevalier Dep. p. 51. On April 1, 2001, Ms. Chevalier met with the management team of the Union Avenue store, which included Plaintiff, Isaac Dickerson (darker than Plaintiff),[2] and Della Watkins (lighter than Plaintiff), to discuss high labor and food costs. *Id.* at 64. On April 9, 2001, all three employees received written warnings from Ms. Chevalier for failure to control labor costs. Pl. Dep. Ex. 10.

On May 23, 2001, Plaintiff, as the Restaurant Manager on duty, received a written warning for improper closing procedures because the cash handling policy was not followed, resulting in a $25 deposit missing at the time of closing. *Id.* at 75, 179, Ex. 15. Ms. Chevalier transferred Plaintiff on the same day to the Third Street store at the same rate of pay and in

---

**2.** By the phrases "lighter than," "darker than," and "same as," the Court refers to Plaintiff's relative skin tone as compared to

that of other Captain D's employees who are discussed in Plaintiff's deposition testimony.

the position of Restaurant Manager. Amended Compl. ¶ 13. Plaintiff opposed the transfer to the Third Street store because it was supposedly in a predominantly poor-African American area and because he believed that his potential bonus would be less because of the store's lower volume. Pl. Dep. pp. 154, 156. Plaintiff alleges that he was transferred because of his dark complexion. Plaintiff acknowledged, however, that a Hospitality Supervisor, who had a lighter skin tone than him, was transferred to another store by Greg Jackson based upon cash handling violations. *Id.* at 199–200.

During Plaintiff's employment at the Union Avenue store, Ms. Chevalier placed three employees in the position of General Manager of the Union Avenue store. *Id.* at 45–46, 48, 50–51, 65–66. These employees included Greg Jackson, Osby Meredith, and Mr. Dickerson, all of whom have the same or darker skin tone as Plaintiff. *Id.*

Plaintiff alleges that Ms. Chevalier made offensive comments to him after his promotion to Restaurant Manager. Compl. ¶¶ 9, 11. Plaintiff recalled one time that Ms. Chevalier called him "the little black sheep." Pl. Dep., pp. 122, 125. Plaintiff also recalled two times that Ms. Chevalier called him "Princess Diana," referring to his sexual orientation. *Id.* at 100–01, 118–24, 231. Likewise. Plaintiff recounted one instance when Ms. Chevalier said that Dominic Meredith and Plaintiff were like night and day. *Id.* at 97. Plaintiff also testified that Ms. Chevalier once said "look how nice and wavy and straight Dominic's hair is" and "oh, Jerry, your hair is nice too." *Id.* at 176. Plaintiff also testified that Ms. Chevalier told him that he would do well at the Third Street store because it was a "first of the month store." *Id.* at 234.

Marcus North, the employee who replaced Plaintiff in the position of Res-taurant Supervisor when Plaintiff was promoted, testified that he heard Ms. Chevalier call Plaintiff "her little black sheep" on a couple of occasions. North Dep., p. 23. Mr. North further stated that he did not know to what Ms. Chevalier was referring when she called Plaintiff "her little black sheep," however, he assumed that she was referring to Plaintiff being "unusual" based on his sexual preference. *Id.* at 23–25. Mr. North also recalled hearing Ms. Chevalier say that she thought Plaintiff "would do better at the Third Street store." *Id.* at 36.

After Dominic Meredith quit his employment with Captain D's and after Plaintiff replaced Dominic Meredith as the Restaurant Manager of the Union Avenue store, Ms. Chevalier purportedly contacted Dominic Meredith and asked him to return to the Union Avenue store as the Restaurant Manager. D. Meredith Dep. pp. 22–25. Dominic Meredith testified that Ms. Chevalier told him that she and Joe Guido, the Regional Director, wanted him to be the Restaurant Manager of the Union Avenue store, instead of Plaintiff. *Id.* Ms. Chevalier allegedly told him that Plaintiff was going to be transferred to the Third Street store because "he [could] handle that store." *Id.* Dominic Meredith returned to the Union Avenue store in approximately February or March 2001 in the position of Restaurant Supervisor. *Id.* Ms. Chevalier purportedly told Dominic Meredith, after his return, that the Union Avenue store needed someone "fair skinned" to be the manager because the store needed someone closer to the background of the customers. *Id.* at 28–33. He also testified that one time he heard Ms. Chevalier refer to Plaintiff as the black sheep. *Id.* at 54–57.

With respect to Plaintiff's transfer to the Third Street store, Defendant asserts that Ms. Chevalier was approached by Mr.

Dickerson, the General Manager of the Union Avenue store, who told her that he felt that Plaintiff needed to get more refined on basic processes on the back line, e.g., the filtering process and learning how to rotate shortening.[3] Chevalier Dep. pp. 48, 53–54. Defendant further contends that Ms. Chevalier, based on her personal observations, felt that Plaintiff needed to have more control over the flow of his shift as Restaurant Manager. *Id.* at 54–56. Defendant maintains that Mr. Dickerson requested that Plaintiff be transferred to a lower volume store. *Id.* at 102–03. Ms. Chevalier purportedly consulted with Joe Guido, and thereafter, approved Mr. Dickerson's request with the understanding that Plaintiff was going to a lower volume store for an indefinite period to better learn the operational processes. *Id.* at 77, 102–03. Plaintiff, however, asserts that management never counseled him on his lack of knowledge of procedures. Pl. Dep. pp. 239–40. Defendant asserts that at this time a Restaurant Manager position was available at the Third Street store, which was a lower volume store. Chevalier Dep., p. 102.

After Plaintiff's transfer, on June 3, 2001, Ms. Chevalier became aware of a $120 shortage at the Third Street store. Chevalier Dep., p. 82. Plaintiff was the manager on duty during the shift. Pl. Dep., p. 141. Ms. Chevalier and Plaintiff discussed the incident on the telephone.

*Id.* at 137. Plaintiff acknowledged that approximately $100 was missing from one of the cashier's drawers. *Id.* at 137. Ms. Chevalier requested a written accounting of the incident from Plaintiff, and she supposedly received a written statement from the cashier involved in the incident. Pl. Dep., p. 137, Chevalier Dep., p. 83. Defendant asserts that Ms. Chevalier concluded that Plaintiff should be held accountable since he was the Restaurant Manager on duty and the cashier could not be held accountable because Plaintiff failed to follow the proper cash handling procedures.[4] Chevalier Dep., p. 82. Joe Guido, the Regional Director, reviewed Ms. Chevalier's findings and decision for consistency with Defendant's company policy.[5] *Id.* at 76. Plaintiff received a written warning for the incident on June 4, 2001. *Id.* at 138, Ex. 8. The warning constituted Plaintiff's third warning related to cash handling procedures. *Id.* at Exs. 2, 8, 9, 15. Plaintiff was demoted to Restaurant Supervisor. *Id.* at Ex. 7. Plaintiff did not appeal the decision, despite being aware of the Defendant's appeal procedure for employment decisions. *Id.* at 138. Ms. Chevalier also demoted Vivian Fowler, who is lighter than Plaintiff, from Hospitality Supervisor to Shift Leader for cash handling violations.[6] Chevalier Dep., pp. 67, 70, 101–02. Defendant asserts that Sarah Foster, who is darker than Plaintiff, replaced Plaintiff as the Restaurant Manager of the Third Street store.[7] *Id.* at 135–36.

---

3. In Defendant's Motion for Summary Judgment, Defendant referred to the statements in this paragraph as undisputed facts. Plaintiff responded that he "has no knowledge of [these] fact[s] and cannot agree or disagree." Pl. Resp. To Def.'s Mot. For Summ. J., p. 4.

4. Plaintiff asserts, with respect to statements concerning the investigation and disciplinary action resulting from the June 3, 2001 money shortage, that he "has no knowledge of whether Ms. Chevalier conducted an investigation and therefore cannot agree or disagree

with what was determined." Pl. Resp. To Def.'s Mot. For Summ. J., p. 4.

5. Plaintiff asserts that "he has no knowledge of this fact and cannot agree or disagree." Pl. Resp. To Def.'s Mot. For Summ. J., p. 4.

6. Plaintiff asserts that he "has no knowledge of this fact and cannot agree or disagree." Pl. Resp. To Def.'s Mot. For Summ. J., p. 4.

7. Plaintiff asserts that he "has no knowledge of this fact and cannot agree or disagree." Pl. Resp. To Def.'s Mot. For Summ. J., p. 4.

On June 28, 2001, Plaintiff filed a charge with the EEOC, claiming color discrimination and sex discrimination based on his transfer from the Union Avenue store and his subsequent demotion. Pl. Dep., Ex. 17. Plaintiff submitted a doctor's note to Defendant on June 29, 2001, stating that he could not work between June 26, 2001 and July 8, 2001. Chevalier Dep., Ex. 6. On July 10, 2001, Plaintiff called Defendant's internal complaint hotline stating:

> I have been discriminated against by Victoria Chevalier. I cannot give a brief description at this time. But because of things that I'm going ... circumstances and situations that she continuously tried to inflict upon me, I have decided to call this number today to alert someone that a letter will be forthcoming. I have also alerted my attorney and the Equal Opportunity Office here in Memphis, TN.

Pl. Dep., Ex. 16. Defendant's Discrimination/Harassment/Retaliation Policy, contained in the employee handbook and on posters in the store, instructs employees to report all incidents of such conduct by filing a complaint with the EEO Corporate Office or by calling the Internal Complaint Hotline.

Plaintiff was not scheduled to work from July 9–15, 2001, because he allegedly failed to inform Defendant that he was ready to return to work. Chevalier Dep., Ex. 6. On July 17, 2001. Plaintiff informed Defendant that he was ready to return to work but requested to work part-time as a Restaurant Supervisor, and his request was denied. On July 18, 2001, Plaintiff filed a second EEOC Charge, alleging retaliation against Defendant. Pl. Dep., p. 186, Ex. 16. In the second EEOC Charge, Plaintiff asserted that he asked Defendant to reduce his status from full-time to part-time Restaurant Supervisor after filing his first EEOC Charge, but Defendant refused to do so in retaliation. *Id.* at Ex. 16.

Plaintiff was placed on the schedule on July 20, 2001, and he worked for four days from 8:00 to 4:00. Chevalier Dep., Ex. 6. On July 30, 2001, Plaintiff alleges that his hours were reduced from 60 hours to 21 hours with no explanation. Compl. ¶ 15. On July 31, 2001, Plaintiff filed a third EEOC Charge alleging retaliation, based upon the reduction of his hours, for his filing of EEOC Charges one and two. Plaintiff did not work from August 6–12, 2001. *Id.* at Ex. 6.

Defendant asserts that Ms. Chevalier called Plaintiff on August 11, 2001, to remind him to call the store for his schedule. *Id.* Plaintiff responded, "You called me for that" and hung up. *Id.* Plaintiff returned to work on August 13, 2001, although he was an hour late for his shift. *Id.* Defendant alleges that Ms. Chevalier called Plaintiff at the store, but Plaintiff was again abrupt.[8] *Id.* Ms. Chevalier prepared a written warning for Plaintiff's behavior. *Id.* On August 14, 2001, Plaintiff allegedly called to report that his Captain D's schedule conflicted with another job, and he allegedly asked to be off on August 18–19 because he was ill.[9] *Id.* Another written warning was prepared for Plaintiff for being tardy on August 13, 2001, and for failing to provide advance notice that he would be unable to work his scheduled shift on August 14, 2001.[10] *Id.*

---

**8.** Plaintiff asserts that he cannot agree or disagree with the statement. Pl. Resp. To Def.'s Mot. For Summ. J., p. 5.

**9.** Plaintiff maintains that he "has no knowledge of this fact and cannot agree or disagree." Pl. Resp. To Def.'s Mot. For Summ. J., p. 5.

**10.** Plaintiff again maintains that he "has no knowledge of this fact and cannot agree or disagree." Pl. Resp. To Def.'s Mot. For Summ. J., p. 5.

A mediation was conducted at the EEOC office on August 21, 2001. *Id.* at 92. At the mediation, the parties agreed to resolve Plaintiff's claim by allowing him to return to work at the Third Street store as Restaurant Supervisor. Pl. Dep., p. 172. The EEOC instructed Plaintiff to call Defendant to be placed back on the work schedule. Pl. Dep., p. 171. Plaintiff asserts that he called the store twice and spoke to Linda Armstrong to see if he was on the schedule. Pl. Dep., pp. 172–74. The first time. Ms. Armstrong allegedly told Plaintiff that he was not on the schedule, and that Plaintiff would need to speak to Ms. Chevalier about being placed on the schedule. *Id.* Plaintiff maintains that when he spoke to Ms. Armstrong on the second occasion, he told her that he would not call back, and that Ms. Armstrong should call him when he was placed on the schedule. *Id.* Defendant contends that Ms. Chevalier told Ms. Armstrong to call Plaintiff to tell him that he was scheduled to work on August 31 and September 1 and 2, 2001. Defendant further asserts that Ms. Armstrong was unable to reach Plaintiff, but she left a message for him. Plaintiff, however, asserts that Ms. Chevalier terminated him on August 27, 2001, and he denies that Ms. Armstrong left a message for him.

Defendant asserts that on September 3, 2001, Plaintiff was considered a no call, no show, and thus was terminated. Defendant maintains that Plaintiff's position of Restaurant Supervisor of the Third Street store remained open for a period of time, but was subsequently filled by Kenneth Moore, an individual of the same skin tone as Plaintiff. Plaintiff disagrees with Defendant's assertion. On November 21, 2001, Defendant filed a fourth EEOC Charge, alleging retaliation based upon his termination. Compl. ¶ 20.

On December 12, 2001, Plaintiff filed suit in this Court, alleging claims for color (skin tone) discrimination, retaliation, hostile work environment/racial harassment, intentional infliction of emotional distress/outrageous conduct, and breach of contract. Plaintiff filed an amended complaint on April 18, 2002, which included Plaintiff's right to sue letters issued by the EEOC. On December 16, 2002, Defendant moved the Court for the summary adjudication of Plaintiff's claims.

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment may be granted if no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. Material facts are those facts which are defined by substantive law and are necessary in order to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Id.*

In evaluating a motion for summary judgment, the evidence, facts, and any inferences must be viewed in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Walborn v. Erie County Care Facility*, 150 F.3d 584, 588 (6th Cir.1998). Once a properly supported motion for summary judgment has been made, the "adverse party may not rest upon the mere allegations or denials of [its] pleading, but … must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Summary judgment is appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348.

## III. ANALYSIS

### A. *Color Discrimination Claims Pursuant To 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, and Tenn.Code Ann. § 4–21–401*

Plaintiff alleges that Defendant discriminated against him, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.;* 42 U.S.C. § 1981; and Tenn.Code Ann. § 4–21–401 of the THRA by disciplining/transferring, demoting, reducing his work hours, and discharging him based on his skin tone. The analysis of Plaintiff's claims for color discrimination is the same under Title VII, the THRA, and 42 U.S.C. § 1981. *See Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.,* 173 F.3d 988, 993 (6th Cir.1999); *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 573 (6th Cir.2000). A member of a protected group may discriminate against another member of the same group in violation of Title VII. *See Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 462 U.S. 669, 682, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983) (rejecting any conclusive presumption that an employer will not discriminate against members of his own race); *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564 (6th Cir.2003) (implicitly holding that discrimination alleged by a member of the ADEA protected class against another ADEA protected class member is an actionable claim). To prevail on a claim of disparate treatment, a plaintiff must show discriminatory animus. *Huguley v. General Motors Corp.,* 52 F.3d 1364, 1370 (6th Cir.1995). Discriminatory animus may be established by direct evidence or may be inferred from a prima facie showing of discrimination. *Id.*

### 1. Direct Evidence

■ "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor" in the adverse employment decision at issue. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 247, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999) (citations omitted). Evidence is direct if it would prove the existence of a fact without any inferences or presumptions, if believed. *Lautner v. AT & T,* 1997 WL 26467, at *2, 1997 U.S.App. Lexis 1267, at *8 (6th Cir.1997) (unpublished opinion); *Norbuta v. Loctite Corp.,* 2001 WL 45114, at *7 (6th Cir.2001) ("Whatever the strength of ... evidence, it is not 'direct' evidence [where it] admits to more than one plausible interpretation, and requires a significant inference or presumption on the part of the trier of fact.") (unpublished opinion). If the plaintiff provides credible direct evidence of discriminatory animus, the burden of persuasion shifts to the defendant to establish by a preponderance of the evidence "that it would have terminated the plaintiff's employment [even] had it not been motivated by discrimination." *Jacklyn,* 176 F.3d at 926. Thus, the employer must do more than merely "articulate" its nondiscriminatory reason for its action. *Blalock v. Metals Trades, Inc.,* 775 F.2d 703, 710 (6th Cir.1985).

In the instant action, Plaintiff offers the following as direct evidence of Ms. Chevalier's discriminatory animus:

1) Plaintiff's assertion that Ms. Chevalier once called him "the little black sheep;"

2) Two instances in which Ms. Chevalier called Plaintiff "Princess Diana," referring to his sexual orientation;

3) Ms. Chevalier's comment to Plaintiff once that Dominic Meredith and Plaintiff were like night and day;

4) Ms. Chevalier's statement, "look how nice and wavy and straight Dominic's hair is" and "oh, Jerry, your hair is nice too;"

5) Mr. North's testimony that he heard Ms. Chevalier refer to Plaintiff as "her little black sheep" on a couple of occasions,

6) Mr. North's and Dominic Meredith's testimony that they heard Ms. Chevalier say that Plaintiff would do well at the Third Street store;

7) Dominic Meredith's testimony that he heard Ms. Chevalier once refer to Plaintiff as "the little black sheep;"

8) Plaintiff's testimony that Ms. Chevalier told him that he would do well at the Third Street store because it is a "first of the month store;" and

9) Dominic Meredith's testimony that Ms. Chevalier told him that the Union Avenue store needed a manager who is "fair skinned."

The statements, such as "the little black sheep" reference, the hair comparison, the "night and day" comment, and the "first of the month" comment, cannot be considered direct evidence because the trier of fact would be required to make inferences to determine whether the statements were discriminatory in meaning.[11] Each of these statements could have more than one meaning and are not necessarily a reference to Plaintiff's color.

■ The Court finds, therefore, that Plaintiff has established direct evidence of discriminatory animus only with respect to Plaintiff's transfer, based on Dominic Meredith's deposition testimony that Ms. Chevalier told him that the Union Avenue store needed a manager who is "fair skinned." This statement, if believed, could establish that unlawful discrimination was at least a motivating factor in the decision to transfer Plaintiff to the Third Street store. The Court, therefore, must now determine whether Defendant has established by a preponderance of the evi-

dence that it would have transferred Plaintiff even had it not been motivated by discriminatory animus.

■ Defendant asserts that Plaintiff was transferred to a lower volume store, at the request of Isaac Dickerson, the General Manager, to allow Plaintiff to become more refined with the basic processes on the back line. Defendant further contends that Ms. Chevalier believed that Plaintiff needed to have more control over the flow of his shift as Restaurant Manager based on her own observations. This is supported by the fact that Ms. Chevalier had a meeting on April 1, 2001, with the management team of the Union Avenue store, which included Plaintiff, Isaac Dickerson (darker than Plaintiff), and Della Watkins (lighter than Plaintiff), to discuss high labor and food costs. On April 9, 2001, all three employees received written warnings from Ms. Chevalier for failure to control labor costs.

Furthermore, Plaintiff received two written cash handling violations prior to his transfer—one on November 14, 2000, and the other on May 23, 2001. The first warning, which Plaintiff signed, stated that Plaintiff must become more accurate with cash handling procedures or further disciplinary action would occur up to termination. The second warning, which Plaintiff signed, was issued on the same day as Plaintiff's transfer. Plaintiff acknowledged in his deposition testimony that a Hospitality Supervisor, who had a lighter skin tone, was also transferred from the Union Avenue store to another store by Greg Jackson, a General Manager, based upon cash handling violations.

Defendant further asserts that the same-actor inference weighs in its favor.

---

**11.** Statements referring to Plaintiff's sexual preference cannot be considered to establish discriminatory animus based on race.

The same actor inference allows the trier of fact "to infer a lack of discrimination from the fact that the same individual both hired and fired the employee." *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 463 (6th Cir.1995). Thus, Defendant argues that because Ms. Chevalier hired and transferred Plaintiff, then a strong presumption exists that her decisions were not based on discriminatory reasons. In *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir.2003), however, the Court held that in cases in which the employee offers direct evidence of discriminatory intent, such that a genuine issue of material fact is raised, courts should not apply the same-actor inference to grant the employer's motion for summary judgment. Thus, the Court must determine whether Defendant's alleged reasons for Plaintiff's transfer are supported by a preponderance of the evidence.

While Defendant's proffered evidence appears to establish legitimate grounds for transferring Plaintiff to the Third Street store, the Court cannot conclude that Defendant has established by a preponderance of the evidence that it would have transferred Plaintiff absent the alleged discriminatory animus. First, Plaintiff maintains that he was not counseled by management about his lack of knowledge of procedures prior to being transferred. Second, Defendant did not offer the testimony or affidavit of Mr. Dickerson to establish that he did in fact tell Ms. Chevalier that Plaintiff needed to be transferred to a lower volume store. Finally, Plaintiff received his second cash handling violation after Ms. Chevalier purportedly told Dominic Meredith that the Union Avenue store needed a manager who is "fair skinned." Based on this evidence, the Court concludes that Defendant failed to carry its burden. Accordingly, Defendant's motion for summary judgment of Plaintiff's claim of color discrimination based upon his transfer is denied.

## 2. Prima Facie Case

As stated above, the Court finds that Plaintiff has not offered any direct evidence that discriminatory animus was at least a motivating factor in his demotion, in his reduction of hours, and discharge. The only direct evidence of discriminatory animus was Ms. Chevalier's alleged statement relating to the placement of someone who is "fair skinned" into the position of · manager at the Union Avenue store. Therefore, the Court must determine whether Plaintiff has established a prima facie case of discrimination with respect to these actions.

A plaintiff may establish a prima facie case of color discrimination by showing by a preponderance of the evidence that he 1) is a member of a protected group, 2) was subject to an adverse employment action, 3) was qualified for the position, and 4) was replaced by an individual outside of the protected class or was treated less favorably than a similarly-situated employee outside of the protected class. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir.2002) (citations omitted).

### a. Demotion

■ Defendant asserts that Plaintiff failed to prove that he was replaced by an individual outside of the protected class or was treated less favorably than a similarly-situated employee outside of the protected class with respect to his demotion. Defendant maintains that Sarah Foster, who is darker than Plaintiff, replaced Plaintiff as Restaurant Manager at the Third Street store. Furthermore, Ms. Chevalier testified that she also demoted Vivian Fowler, who is lighter than Plaintiff, from Hospitality Supervisor to Shift Leader for cash handling violations, the very reason Defendant gives for Plaintiff's demotion.

Plaintiff asserts that he has no knowledge of these facts and cannot agree or

disagree. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the plaintiff "must set forth specific facts showing that there is a genuine issue for trial." The plaintiff, therefore, cannot rely on speculation, but must go beyond the pleadings and present facts on each element of his case to show that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 585, 106 S.Ct. 1348. The Court finds that Plaintiff failed to show that he was replaced by an individual outside the protected class or that he was treated less favorably than a similarly-situated employee outside of the protected class when he was demoted, thus, he did not set forth specific facts proving the fourth element of a prima facie case of color discrimination. Accordingly, Defendant's motion for summary judgment as to Plaintiff's claim for color discrimination based upon demotion is granted.

### b. Reduction of Hours

■ Plaintiff also appears to argue that the reduction of his hours after his demotion to Restaurant Supervisor was the result of color discrimination. The Court finds that Plaintiff failed to prove a prima facie case of color discrimination based upon a reduction of hours because he did not offer any evidence to establish that he was treated less favorably than someone who had lighter skin based upon his reduction of hours. Plaintiff, therefore, did not prove by a preponderance of the evidence the fourth element of a prima facie case of color discrimination. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff has not demonstrated that a genuine issue of material fact exists as to his claim for color discrimination based upon a reduction of hours. Accordingly, the Court grants Defendant's motion for summary judgment as to this claim.

### c. Discharge

■ Plaintiff's discharge from the Third Street store also constitutes an adverse employment action. Defendant maintains, however, that Plaintiff failed to establish that he was replaced by an individual outside of the protected class or was treated less favorably than a similarly situated employee outside of the protected class. Defendant asserts that after Plaintiff's discharge, the position of Restaurant Supervisor remained open for a period of time, but was subsequently filled by Kenneth Moore, an individual of the same skin tone as Plaintiff.

Although Plaintiff disagrees with Defendant's assertion, he does not offer any specific fact to dispute that Kenneth Moore, an individual of the same skin tone as Plaintiff, replaced him. Moreover, Plaintiff does not offer any specific fact to establish that he was treated less favorably than someone with lighter skin by being terminated for allegedly failing to call or show up for his shift. The Court finds, therefore, that Plaintiff failed to establish a prima facie case of color discrimination based upon his discharge. Accordingly, Defendant's motion for summary judgment as to Plaintiff's claim for color discrimination based upon discharge is granted.

### B. Retaliation Claims

■ Plaintiff asserts that Defendant retaliated against him in violation of Title VII. To establish a prima facie case of retaliation, the plaintiff must establish that "(1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Nguyen v. City of Cleve-*

*land,* 229 F.3d 559, 563 (6th Cir.2000). If the plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. *Canitia v. Yellow Freight Sys.,* 903 F.2d 1064, 1066 (6th Cir.1990). The plaintiff must then demonstrate by a preponderance of the evidence "that the proffered reason was not the true reason for the employment decision." *Id.* (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). A plaintiff may establish pretext by showing that the proffered reason 1) has no basis in fact, 2) did not actually motivate the adverse employment action, or 3) was insufficient to motivate the adverse employment action. *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1084 (6th Cir.1994).

Plaintiff appears to assert that he was subject to retaliation as evidenced by Defendant's denial of his request for a reduction of hours, Defendant's subsequent reduction of his hours, and his discharge, which occurred after the filing of his initial EEOC Charges.[12] The Court must determine whether Plaintiff has established a prima facie case of retaliation with respect to these employment actions.

Plaintiff filed four EEOC charges. The initial three EEOC charges were filed on June 28, July 18, and July 31, 2001, and Defendant was notified of the filing of these charges. Defendant refused to decrease Plaintiff's work hours, subsequently reduced them without notice, and then discharged Plaintiff after the EEOC Charges were filed. Plaintiff alleges that these acts constituted adverse employment actions. The Court finds that Plaintiff has estab-lished the first three elements of the prima facie case of retaliation based on his reduction of hours and his discharge. As for Plaintiff's claim for retaliation based upon Defendant's initial refusal to reduce Plaintiff's hours, however, the Court finds that Plaintiff failed to establish that the denial of a work hour reduction constitutes an adverse employment action. Accordingly, Defendant's motion for summary judgment of Plaintiff's claim of retaliation based on a denial of his request for reduced hours is granted.

■ Defendant argues that Plaintiff failed to prove the fourth element of a prima facie case of retaliation based upon the reduction of Plaintiff's hours and his discharge, i.e., that there was a causal connection between the filing of his EEOC Charges and the reduction of his hours, and his discharge. To establish causal connection, the plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken absent participation in the protected activity. *Id.* (citations omitted). Temporal proximity between the adverse action and the protected activity is insufficient to support an inference of retaliation when no other compelling evidence has been presented. *Moon v. Transport Drivers, Inc.,* 836 F.2d 226, 229 (6th Cir.1987).

Defendant argues that Plaintiff's evidence of causal connection is limited to temporal proximity. Plaintiff filed his first EEOC Charge on June 28, 2001, alleging race and sex discrimination. With respect to Plaintiff's claim for retaliation based upon the reduction of Plaintiff's hours, Plaintiff asserts that on July 17, 2001, he

---

**12.** Plaintiff did not argue retaliation based upon Defendant's denial of Plaintiff's request for a reduction of hours and based upon Defendant's subsequent reduction of Plaintiff's hours. *See* Pl. Resp. To Def.'s Mot. For Summ. J. at 13–16. The Court, however, will analyze these claims, as Plaintiff appears to indicate that retaliation occurred as a result of these instances.

informed Defendant that he was ready to return to work but requested to work part-time as a Restaurant Supervisor, and his request was denied. Plaintiff filed a second EEOC Charge alleging retaliation on July 18, 2001. Defendant placed Plaintiff on the schedule to work on July 20, 2001, and he worked for four days from 8:00 to 4:00. Plaintiff alleges that his hours were reduced on July 30, 2001, from 60 hours to 21 hours with no explanation. Plaintiff asserts, in effect, that a causal connection exists between the reduction of his hours on July 30 and the filing of EEOC Charges one and two, less than a month earlier.

The Court finds that Plaintiff has not alleged sufficient facts from which the Court can infer that Defendant's reduction of Plaintiff's hours was causally connected to Plaintiff's filing of EEOC Charge one and two. The only evidence that Plaintiff provides to establish a causal connection is the temporal proximity between the reduction of his hours and the filing of the EEOC Charges, and his assertion that he was initially denied a request for a reduction in hours. This evidence, however, leads the Court to infer that Defendant reduced Plaintiff's hours in an effort to appease Plaintiff after he filed an EEOC Charge alleging retaliation based upon the denial of Plaintiff's request to have his hours reduced. Accordingly, the Court finds that Plaintiff failed to establish a prima facie claim of retaliation with respect to the reduction of his hours. Therefore, Defendant's motion for summary judgment of Plaintiff's claim for re-taliation based upon the reduction of his hours is granted.

■ Plaintiff further asserts that Defendant retaliated against him for filing EEOC Charges by discharging him. Defendant argues that Plaintiff failed to sufficiently allege a causal connection between the filings and his termination. The Court finds, however, that Plaintiff has established sufficient evidence for the Court to infer that a causal link exists between his termination and the filing of the EEOC Charges. First, the termination occurred shortly after the filing of the EEOC Charges. Second, Ms. Chevalier's testimony, given during an unemployment compensation hearing and at her deposition, concerning the events leading to Plaintiff's termination, is contradictory. For instance, Ms. Chevalier testified at the unemployment compensation hearing that Plaintiff did not call to check his schedule, but later in her testimony she indicated that he did call.[13] Although the Court makes no findings as to Ms. Chevalier's credibility, the Court finds that the contradictions in her testimony and the temporal proximity of the discharge to the EEOC filings are enough to infer that a causal connection exists.

■ Defendant next asserts that Plaintiff failed to establish that its legitimate, nondiscriminatory reason for Plaintiff's discharge was pretextual. Defendant's articulated legitimate, nondiscriminatory reason for Plaintiff's discharge is that he failed to call or show up after the EEOC mediation on August 21, 2001.

---

13. Defendant asserts that Ms. Chevalier's testimony from the unemployment hearing should not be considered by the Court to determine whether Plaintiff has established a claim for retaliatory discharge. Defendant maintains that "Plaintiff cannot rely on the unemployment compensations [sic] board's ruling to create a triable issue because the ruling is inadmissible." Reply In Support of Def.'s Mot. For Summ. J., p. 12. The Court, however, is not relying on the ruling of the unemployment compensation board, but instead on the testimony that Ms. Chevalier presented during the hearing. The Court is not ruling, at this time, however, as to the admissibility of the unemployment compensation hearing transcript for other purposes.

Plaintiff asserts, however, that he called the store twice after the EEOC mediation and spoke to Linda Armstrong to see if he was on the schedule. The first time Plaintiff called, he alleges that Ms. Armstrong told him that he was not on the schedule, and he would need to speak to Ms. Chevalier about being placed on the schedule. Plaintiff maintains that the next time he called the store he again spoke to Ms. Armstrong, and he told her that he would not call back. He further asserts that he told Ms. Armstrong to call him when he was placed on the schedule, but he was never contacted. Plaintiff argues that he was never placed on the schedule, and thus Defendant's assertion that he was terminated because of "no call, no show" was not its actual motivation for discharge. The Court concludes that Plaintiff has offered sufficient facts to show that Defendant's legitimate, nondiscriminatory reason for Plaintiff's discharge was pretextual. The Court therefore denies Defendant's motion for summary judgment as to Plaintiff's claim for retaliation based upon discharge.

### C. Hostile Work Environment/Racial Harassment

██ Plaintiff alleges that he was subjected to a hostile work environment based on color. To establish a claim for hostile work environment in violation of Title VII, the plaintiff must prove that (1) he belongs to a protected group; (2) he was subject to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment; and (5) defendant knew or should have known about the harassment and failed to take action. *Moore v. KUKA Welding Sys.,* 171 F.3d 1073, 1078–79 (6th Cir.1999).

Harassment affects a "term, condition or privilege of employment" if it is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and creates an abusive working environment. *Id.* at 1079. In sum, the plaintiff's evidence must be sufficient to show that the alleged conduct constituted an unreasonably abusive or offensive work-related environment or adversely affected the plaintiff's ability to do his job. *Erebia v. Chrysler Plastic Prods. Corp.,* 772 F.2d 1250, 1256 (6th Cir.1985). The conduct must be sufficiently severe or pervasive to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as such. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Courts must consider the totality of the circumstances in determining whether, objectively, the alleged harassment constitutes a hostile work environment. *Williams v. General Motors Corp.,* 187 F.3d 553, 562 (6th Cir.1999). Appropriate factors to consider include the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfered with an employee's work performance. *Harris,* 510 U.S. at 23, 114 S.Ct. at 371. Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998). Isolated incidents alone must be extremely serious to amount to discriminatory changes in the terms or conditions of employment. *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 790 (6th Cir.2000); *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2nd Cir.1998). In *Livingston,* for example, the court held that a supervisor calling the Latino claimant a "Spic" three times was sufficiently severe to objectively constitute harassment. *Id.*

Defendant argues that Plaintiff failed to prove a prima facie case of harassment because the alleged conduct was not sufficiently severe or pervasive to constitute a hostile work environment. Plaintiff asserts that he constantly endured the derogatory skin tone comments of Ms. Chevalier and that other witnesses testified that she discussed color issues frequently in the workplace. Plaintiff further asserts that the conduct was so pervasive that other employees and customers began to call him names, and that he cried after one episode of name-calling. Plaintiff also relies on one instance in which Ms. Chevalier laughed during his deposition testimony when he was recounting how he felt. Upon reviewing the deposition testimony, the Court finds that the only instance in which employees and customers called Plaintiff names was when they called him "Princess Diana." Furthermore, the only instance which the record discloses that Plaintiff cried was after being called "Princess Diana." Likewise, the deposition testimony reflects that Ms. Chevalier allegedly laughed when Plaintiff discussed how he felt when he was called "Princess Diana." Plaintiff cannot rely on statements related to his sexual preference to support a claim of hostile work environment based on race, because such statements are not related to Plaintiff's color.

▮ Other evidence that Plaintiff relies upon to establish a claim for hostile work environment includes Plaintiff's assertion that he recalled one instance in which Ms. Chevalier referred to him as the "black sheep," one instance in which Ms. Chevalier commented on his hair in comparison to someone else's hair, and one instance when Ms. Chevalier stated that Plaintiff and another employee were like night and day. Plaintiff further testified that he could not recall each and every particular harassing statement that he endured, however, they were made on a regular basis. Mr. North and Dominic Meredith testified that they heard Ms. Chevalier refer to Plaintiff as the "little black sheep," two times and one time, respectively. Dominic Meredith also recalled Ms. Chevalier stating that the Union Avenue store needed a manager who was "fair skinned."

In *Morris*, the Sixth Circuit held that the defendant's behavior towards the plaintiff was objectively severe and pervasive to constitute a hostile environment. *Morris*, 201 F.3d 784 (6th Cir.2000). In the initial proceedings, the state court had ordered the plaintiff's supervisor to relocate because he had sexually harassed the plaintiff. *Id.* at 793. In retaliation, the supervisor, against the court's orders, showed up at her office fifteen times, telephoned the plaintiff over thirty times, sat outside her office window and made faces. *Id.* He also followed the plaintiff home from work and gave her "the finger," destroyed the television that the plaintiff occasionally watched at work, and threw nails onto the plaintiff's driveway on several occasions. *Id.* When comparing the facts in this case with those in *Morris*, the Court finds that, based on the totality of the circumstances, the conduct alleged by Plaintiff to be abusive is not so severe as to affect a term or condition of employment.

The question becomes, however, whether Plaintiff has established that Ms. Chevalier's conduct was sufficiently pervasive to create an environment that a reasonable person would find hostile or abusive. In *Abeita v. TransAmerica Mailings, Inc.,* 159 F.3d 246, 252 (6th Cir.1998), the plaintiff alleged discriminatory conduct in the form of several offensive comments made over a period of seven years. Only one of the statements was specifically directed at plaintiff Abeita. *Id.* The United States Court of Appeals for the Sixth Circuit held that the "District Court's analysis omits the plaintiff's claim that [the supervisor's]

sexual comments were 'commonplace,' 'ongoing,' and 'continuing.' This omission is critical because ... [the statements] appear to be of approximately equal severity to those found in [*Black v. Zaring Homes, Inc.*, 104 F.3d 822 (6th Cir.), *cert. denied*, 522 U.S. 865, 118 S.Ct. 172, 139 L.Ed.2d 114, 139 L.Ed.2d 114 (1997)]." *Id.* at 252. The court determined that the fact that the plaintiff could recount no more than five specific instances of abusive comments being made was for the finder of fact to review when weighing her testimony because the plaintiff asserted that the abusive comments "were commonplace, ongoing and continual." *Id.*

Plaintiff in the instant action alleges that Ms. Chevalier's comments were made on a regular basis. Based upon the Sixth Circuit's holding in *Abeita*, the Court finds that Plaintiff has asserted sufficient facts for the finder of fact to determine that the alleged comments were sufficiently pervasive to alter the conditions of Plaintiff's employment. *Cf. Burnett v. Tyco Corp.*, 203 F.3d 980, 984 (6th Cir.2000) (holding that Plaintiff did not allege that the conduct was commonplace, ongoing, or continuing and that three alleged instances spread out at the beginning and at the end of a six-month period were not commonplace, ongoing, or continuing). Therefore, the Court finds that Plaintiff has established a prima facie case of hostile work environment.

■ Defendant further argues that it is entitled to the affirmative defense set forth in *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The Supreme Court stated in *Faragher* that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immedi-

ate (or successively higher) authority over the employee." *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. An employer may avoid vicarious liability if it establishes by a preponderance of the evidence that 1) it exercised reasonable care to prevent and correct promptly any harassing behavior, and 2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Id.* An employer is not entitled to the affirmative defense, however, if the supervisor's harassment culminates in a tangible employment action. *Id.* at 808, 118 S.Ct. 2275. Tangible employment action includes discharge, demotion, or undesirable reassignment. *Id.; see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

In the instant action, Plaintiff has alleged in effect that he was transferred as a result of the harassment. Defendant, therefore, is not entitled to the affirmative defense set forth in *Faragher*. Accordingly, Defendant's motion for summary judgment as to Plaintiff's claim for hostile work environment/harassment is denied.

**D. Intentional Infliction of Emotional Distress/Outrageous Conduct** [14]

■ Plaintiff alleges that the behavior of Ms. Chevalier and of Defendant's counsel in this matter supports Plaintiff's claim for outrageous conduct. To establish a claim for outrageous conduct, a plaintiff must establish that the conduct complained of (1) was intentional or reckless; (2) was so outrageous that it is not tolerated by civilized society; and (3) resulted in serious mental injury. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn.1997) (citations omitted). Liability for mental distress

---

**14.** Intentional infliction of emotional distress and outrageous conduct are different names for the same cause of action. *Moorhead v.*

*J.C. Penney Co., Inc.*, 555 S.W.2d 713, 717 (Tenn.1977).

damages "does not extend to mere insults, indignities, threats, annoyances, petty oppression or other trivialities." *Id.* (quoting *Medlin v. Allied Inv. Co.*, 217 Tenn. 469, 398 S.W.2d 270, 274 (1966)). To determine whether conduct is so intolerable as to be outrageous, Tennessee courts apply the following standard enunciated in the Restatement (Second) of Torts § 46, comment d:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

*Id.* at 623.

Plaintiff asserts that he endured Ms. Chevalier's taunting about his skin tone and her calling him "Princess Diana." Plaintiff maintains that Ms. Chevalier called Plaintiff "Princess Diana" so frequently that other employees and customers called him by the name as well. Plaintiff also asserts that Ms. Chevalier's statements concerning his skin tone, discussed previously, were outrageous.

Plaintiff further relies on statements made by a paralegal of the law firm which is representing Defendant to one of Plaintiff's healthcare providers. These statements, however, may not be considered when determining whether Plaintiff has alleged a claim of outrageous conduct against Defendant because Defendant's law firm is not a party to this action. Thus, to determine whether Plaintiff has alleged a cause of action for outrageous conduct, sufficient to overcome summary judgment, the Court may only consider the statements supposedly made by Ms. Chevalier.

Defendant asserts that Ms. Chevalier's comments were not so outrageous that civilized society would find them intolerable. The Court agrees. Ms. Chevalier's conduct was not so intolerable as to be considered outrageous under the onerous standard discussed earlier. First, Plaintiff testified that he was not offended initially by Ms. Chevalier's reference to him as "Princess Diana." Thus, the Court cannot conclude that the usage of the phrase "Princess Diana" is so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Likewise, with respect to Ms. Chevalier's alleged racially motivated comments, such as calling Plaintiff "the little black sheep," and discussing Plaintiff's hair, the Court finds that these statements do not rise to the level of being regarded as atrocious and utterly intolerable in a civilized community. These statements, at most, may be viewed as insults, indignities, threats, annoyances, petty oppression or other trivialities. As such, the Court finds that the recitation of these facts to an average member of the community would not arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" Accordingly, the Court grants Defendant's motion for summary judgment with respect to Plaintiff's claim for outrageous conduct.

## E. Breach of Contract/Detrimental Reliance

■ Plaintiff asserts that the December 19, 2000 writing, signed by himself, Ms. Chevalier, and Greg Jackson, constitutes a contract for a definite period of time, which was one year. The writing provided:

> Jerry Brack ss# 411–98–4060 is presently a Restaurant Supervisor [who] will be promoted to [Restaurant Manager] deadline December 30, 2000[sic] At a pay Rate [sic] of $27,300 per year. That is $525.00 per week. January 1, 2001[,] it will become effective.

Defendant argues that the writing is not an enforceable contract.

In Tennessee, "a contract of employment for an indefinite term is a contract at will and can be terminated by either party at any time without cause." *Randolph v. Dominion Bank of Middle Tenn.,* 826 S.W.2d 477, 478 (Tenn.Ct.App.1991). The presumption that an employment relationship is at-will can be overcome only "by specific language guaranteeing a definite term of employment." *Davis v. Connecticut Gen'l Life Ins. Co.,* 743 F.Supp. 1273, 1280 (M.D.Tenn.1990). Thus, unless the term of employment is specified, language such as the compensation an employee is to receive does not overcome the presumption of an at-will employment relationship. *See id.*

In *Thompson v. Telco, Inc.,* 1999 WL 548610, at *1 (Tenn.Ct.App.1999) (unpublished), the court held that a provision in a writing that stated that the employee was "guaranteed a minimum $1.00 per hour raise per year over the next five (5) years," did not establish a contract for a definite term. The *Thompson* court concluded that the writing was "an agreement reflecting the intent of the parties" which was intended "to convey the level at which [the employee] would be compensated, not

the length of time he would be employed." *Id.* at *7.

In the instant action, the only mention of time in the writing is in the phrase, "[a]t a pay Rate of $27,300 per year." The Court finds that, like the agreement in *Thompson,* the reference to "per year" is not sufficiently specific to create a contract for a definite term of employment. *See also Loeffler v. Kjellgren,* 884 S.W.2d 463 (Tenn.Ct.App.1994) (holding that a letter, providing that two years of salary, reimbursement for relocation expenses, and additional compensation to be earned after four years of service, was not a "guarantee of employment for a definite term."). The employment relationship between Plaintiff and Defendant was at-will. Accordingly, the Court finds that no genuine issue of material fact exists as to Plaintiff's claim for breach of contract. The Court, therefore, grants Defendant's motion for summary judgment as to the breach of contract claim.

■ Plaintiff also appears to assert that he detrimentally relied upon the writing to leave his job with the Memphis Credit Union. Under Tennessee law, detrimental reliance/promissory estoppel is limited to instances when: "(1) the detriment suffered in reliance was substantial in an economic sense; (2) the substantial loss to the promisee acting in reliance [was] foreseeable by the promisor; and (3) the promisee ... act[ed] reasonab[ly] in justifiable reliance on the promise as made." *Smith v. Harriman Utility Bd.,* 26 S.W.3d 879, 886 (Tenn.Ct.App.2000)(quoting *Alden v. Presley,* 637 S.W.2d 862, 864 (Tenn.1982)).

In *Smith,* the Court held that the plaintiff had not stated a claim for promissory estoppel. *Id.* The agreement at issue was executed after the plaintiff began working for the defendant. *See id.* at 886. The *Smith* court determined that summary

judgment was proper because the plaintiff failed to show that the defendant guaranteed the plaintiff continued employment. *Id.* at 887. The Court concluded that an at-will employment contract creates no detrimental reliance. *Id.* at 884.

Like the agreement in *Smith*, the writing in the instant action was executed after Plaintiff began his employment with Captain D's. As discussed above, the writing was not a contract for a definite term, and thus the employment relationship was at-will. Accordingly, the Court grants Defendant's motion for summary judgment of Plaintiff's claim of detrimental reliance/promissory estoppel on the writing.

## IV. CONCLUSION

Defendant's motion for summary judgment is granted as to Plaintiff's claims for color discrimination based on Plaintiff's demotion, reduction of hours, and discharge. Furthermore, the Court grants Defendant's motion for summary judgment with respect to Plaintiff's claims for retaliation based on the denial of Plaintiff's request for a reduction of hours and the reduction of Plaintiff's hours. The Court also grants Defendant's motion with respect to Plaintiff's claims for outrageous conduct/intentional infliction of emotional distress and breach of contract/detrimental reliance. Defendant's motion for summary judgment is denied as to Plaintiff's claims for color discrimination based on his transfer, retaliation based on discharge, and hostile work environment/racial harassment.